USDC SCAN INDEX SHEET

















DMG   1/28/04   12:15

3:04-M -00229   USA V. MILLER

*1*

*CRCMP.*

Affidavit in Lieu of Indictment

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

FILED
04 JAN 28 PM 12: 08
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF
DEPUTY

Magistrate's Case No. **04 mg 0229**

The accused _Dean G. Miller_____, now presented before

_Judge Stivens_____, United States Magistrate Judge, Southern District

of California, for arraignment and fixing of bail, has been charged by a

federal grand jury by way of an indictment in the _Western_ District of

_Texas_ on _Dec. 12, 2003_, with the offense(s) of ___See Copy

of Attached Warrant_____

_____ in violation of Title _18_, United

States Code, Section _371, 545, 2342(a), 2320(a), 1341, 1343, 1349, 1956(h)
1956 (a)(i)(A)(i)_

The arrest warrant was issued on __January 6, 2004____.

Bond **HAS/~~HAS NOT~~** been recommended by an Assistant U. S. Attorney in the

district in which the charges are pending **[in the sum of $40,000.00 ].**
CASH or CORPORATE SURETY

DATED: __01-28-04___

_____John P. Binks_____
Affiant

_____S/A ICE_____
Title

Lodged with me this _28th_ day of _Jan___, 20_04_, in lieu of

certified copy of the indictment against the accused.

_____
**HONORABLE**
United States Magistrate Judge

AO 442   (Rev. 10/03) Warrant for Arrest

# UNITED STATES DISTRICT COURT
## Western District of Texas

UNITED STATES OF AMERICA

V.

Dean Miller

**WARRANT FOR ARREST**

Case Number: EP-03-CR-2294-PRM

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest _____ Dean Miller _____
Name

and bring him or her forthwith to the nearest magistrate judge to answer a(n)

☒ Indictment   ☐ Information   ☐ Complaint   ☐ Order of court   ☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice

charging him or her with   (brief description of offense)
Conspiracy to smuggle cigarettes into US., Traffic in contraband cigarettes and traffic in counterfeit goods, Conspiracy to commit wire fraud and commit mail fraud, aiding and abeting, smuggling contraband and counterfeit cigarettes, aiding and abeting, and trafficking in contraband and counterfeit cigarettes, aiding and abetting, and wire fraud, Conspiracy to launder monetary instruments, aiding and abetting and laundering monetary instruments

in violation of _____ 18 _____ United States Code,   371,545,2342(a),2320(a),1341,1343,1349, 1956(h), 1956(a)(1)(A)(i)

William G. Putnicki
Name of Issuing Officer

Clerk, US District Court
Title of Issuing Officer

M. Twillo
Signature of Issuing Officer

12/12/03, El Paso, Tx.
Date and Location

Bail Fixed at:
$40,000.00 Corporate Surety                    By        US Magistrate Judge Norbert Garney
                                                                  Name of Judicial Officer

— RETURN —

This warrant was received and executed with the arrest of the above-named defendant at

EXECUTE ORIGINAL AT
US MARSHALS/WARRANTS
OFFICE.

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| | | |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | <u>SEALED INDICTMENT</u> |
| | § | |
| Plaintiff, | § | Cause No. EP-03-CR-_____ |
| | § | |
| v. | § | [VIOLATIONS: |
| | § | <u>CT 1</u>: 18 §§ 371, 545, 2342(a), 2320(a), 1343 |
| JORGE ABRAHAM, also known | § | & 1341: Conspiracy to: Smuggle Cigarettes |
| as (aka): George, | § | into U.S., Traffic in Contraband Cigarettes, |
| aka: Jorge Abraham Garcia, | § | Traffic in Counterfeit Goods, Commit Wire |
| FELIPE CASTANEDA, | § | Fraud and Commit Mail Fraud; |
| IGNACIO ABRAHAM, aka: Nasser, | § | <u>CTS 2 - 15</u>: 18 §§ 2 & 545 - Aiding and |
| SERGIO NAJERA-DIAZ, | § | Abetting, and Smuggling Contraband and |
| PABLO MAURICIO FLORES -RIOS, | § | Counterfeit Cigarettes; |
| aka: Mauricio, | § | <u>CTS 16 - 46</u>: 18 U.S.C. §§ 2 & 2342(a) - |
| MARIO LUEVANO-GARCIA, | § | Aiding and Abetting, and Trafficking in |
| OSCAR CESAR GARCIA JAQUEZ, | § | Contraband Cigarettes; |
| OMAR JARAMILLO, | § | <u>CTS 47 - 49</u>: 18 U.S.C. §§ 2 & 2320(a) - |
| LORENZO ENRIQUE CAMPOS, | § | Aiding and Abetting, and Trafficking in |
| aka: Henry, | § | Counterfeit Cigarettes; |
| DEAN MILLER, | § | <u>CTS 50 - 56</u>: 18 U.S.C. §§ 2 & 1343 - |
| ROBERT TARANTINO, | § | Aiding and Abetting, and Wire Fraud; |
| aka: Mr. T, aka: Andy, | § | <u>CTS 57 - 60</u>: 18 U.S.C. §§ 2 & 1341 - Aiding |
| SCOTT SNYDER, | § | and Abetting, and Mail Fraud; |
| TIMOTHY J. FARNHAM, aka: Güero, | § | <u>CT 61</u>: 18 U.S.C. § 1001 - Material False |
| DONALD DELAND, aka: Pelon, | § | Statements and Representations; |
| PETER L. PEMBLETON, | § | <u>CT 62</u>: 18 U.S.C. § 1956(h) - Conspiracy to |
| ANTHONY LEONE, aka: Tony, | § | Launder Monetary Instruments; |
| aka: The Italian | § | <u>CTS 63 - 89</u>: 18 U.S.C. §§ 2 & 1956 |
| FERNANDO ORTIZ, | § | (a)(1)(A)(i) - Aiding and Abetting, and |
| aka: Capulina, | § | Laundering Monetary Instruments; and |
| ANTONIO ARANDA and | § | <u>CTS 90 - 91</u>: 18 U.S.C. §1956 (a)(2)(A) - |
| SAUL IGLESIAS, | § | Laundering Monetary Instruments |
| | § | |
| | § | 18:982 - Notice of Criminal forfeiture.] |
| Defendants. | § | |

THE GRAND JURY CHARGES THAT:

<u>INTRODUCTION</u>

At all times relevant to this indictment:

1.  JORGE ABRAHAM was the leader and organizer of a smuggling organization involving primarily the diversion of cigarettes not intended for domestic consumption, namely contraband cigarettes, as further defined below, and counterfeit cigarettes, also further defined below. JORGE ABRAHAM, members, partners and associates of this smuggling scheme are also referred to as the Organization. The smuggling Organization was centered in the El Paso, Texas, area. The primary objective of the Organization was to generate income by illegally avoiding the payment of all applicable federal taxes and duties, and of all state taxes on the goods in which the Organization smuggled and trafficked.

    The Organization employed different techniques to smuggle and introduce into the commerce of the United States contraband and counterfeit cigarettes. These included, but were not limited to, the manipulation of the United States Customs Service (USCS)[1] in-bond system, further described below. The Organization would modify and adapt its techniques and the goods which would be trafficked in direct response to any measurable success by law enforcement in curtailing its illegal activities. The Organization did not limit its smuggling activities to cigarettes. It also smuggled liquor, leather goods and textiles, among other things.

    JORGE ABRAHAM also used different entities in furtherance of the Organization's objectives. These included, but were not limited to: Sun City Abraham Transportation, Sun City International Trading, Sun City Abraham Transportation Inc., Sun City Abraham and Sun City Abraham Transportation, doing business as (dba): Sun City Trucking.

    JORGE ABRAHAM has no known legitimate source of income. Further, JORGE ABRAHAM is physically disabled and, as a result, requires the assistance of other co-conspirators for his day-to-day illegal business activities.

2.  FELIPE CASTANEDA was a supervisory member of the Organization and was JORGE ABRAHAM's closest associate in the cigarette diversion and counterfeit cigarette smuggling scheme. CASTANEDA managed, supervised and coordinated the purchase of contraband cigarettes in El Paso, Texas, and the transportation for the contraband and counterfeit cigarettes. Additionally, once the cigarettes were shipped in interstate commerce, CASTANEDA, along with other members of the Organization, typically travelled to the intended destination of the cigarettes to await their arrival and ensure the subsequent distribution of the cigarettes to the New York associates.

---

[1]During most of the time frame of the dates alleged in this indictment, the United States Customs Service (USCS), was an agency of the Department of the Treasury. However, as of March 1, 2003, the United States Customs Service became an agency of the Department of Homeland Security. The former USCS is now known as the Immigration and Customs Enforcement (ICE).

3.    IGNACIO ABRAHAM is the father of JORGE ABRAHAM and was also a supervisory member of the Organization.  IGNACIO ABRAHAM's role in the Organization was to ensure that cigarettes were safely delivered to the New York distributors.  IGNACIO ABRAHAM was involved in managing some of the financial aspects of the Organization's activities, including providing checks for the purchase of cigarettes.  He also collected the proceeds generated by the Organization's illegal activities.  Except for the receipt of Social Security benefits, IGNACIO ABRAHAM has no known legitimate source of income.

4.    MARIO LUEVANO-GARCIA was another member of the Organization and his duties included being a personal assistant for JORGE ABRAHAM and transporting fraudulent documents necessary to manipulate the United States Customs Service (USCS) in-bond system for the Organization.  These documents were submitted to USCS in an effort to gain the release of contraband cigarettes seized by USCS in El Paso, Texas.  LUEVANO-GARCIA has no known legitimate source of income.

5.    PABLO MAURICIO FLORES -RIOS was another member of the Organization. FLORES-RIOS' primary role in the organization was to act as the Organization's "banker" and "accountant."  FLORES-RIOS has no known legitimate source of income.

6.    SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ, and OMAR JARAMILLO were other members of the Organization who served as personal assistants for JORGE ABRAHAM. They, like the other members, were present during the Organization's meetings, which often took place in and around JORGE ABRAHAM's specially equipped van. They each aided and abetted the Organization in carrying out its illegal objectives. NAJERA-DIAZ, GARCIA JAQUEZ, and JARAMILLO have no known legitimate source of income.

7.    LORENZO ENRIQUE CAMPOS worked as a "runner" for a local attorney and assisted the Organization in coordinating its transportation needs.  CAMPOS allowed the use of the attorney's office facsimile machine to receive facsimile transmissions to further the Organization's criminal activity. CAMPOS also assisted the Organization in attempting to secure, through fraudulent documentation, the release of contraband cigarettes seized by USCS.

8.    DEAN MILLER was JORGE ABRAHAM's California partner and they purchased large quantities of counterfeit cigarettes from the Far East, smuggled the cigarettes into the United States, and transported and attempted to transport the cigarettes in interstate commerce for distribution in the United States. DEAN MILLER used an entity named: Cardservices DM to further the Organization's objectives.

9.    ROBERT TARANTINO aided and attempted to aid the Organization's efforts to manipulate the "in-bond" system through fraudulent documentation. ROBERT TARANTINO used an entity named: Ascot Trading Company and A Trade LLC to further the Organization's

3

objectives.

10.   SCOTT SNYDER owned and operated Snyder Enterprises, and did business as: Iroquois Tobacco Company in Irving, New York. Snyder Enterprises and Iroquois Tobacco Company purchased, received and sold counterfeit and contraband cigarettes supplied by the Organization. SNYDER was one of the Organization's New York associates.

11.   DONALD DELAND operated the Double D Smoke Shop, Route 20, Irving, New York. DELAND purchased, received and sold counterfeit and contraband cigarettes supplied by the Organization. DELAND was one of the Organization's New York associates. DELAND also used an entity named: Sovereignty Venture to further the Organization's objectives.

12.   TIMOTHY J. FARNHAM worked with SCOTT SNYDER and DONALD DELAND in Irving, New York, and also purchased, received and sold counterfeit and contraband cigarettes supplied by the Organization. FARNHAM was one of the Organization's New York associates. FARNHAM also did business as: Tobacco Traders & Trust (sometimes referred to as: Tobacco Traders Trust).

13.   PETER L. PEMBLETON owned and operated All Nations Tobacco, 56 Main Street, Salamanca, New York. PEMBLETON purchased, received and sold contraband cigarettes supplied by the Organization. PEMBLETON also trafficked in counterfeit cigarettes. PEMBLETON was one of the Organization's New York associates.

14.   ANTHONY LEONE worked for PETER L. PEMBLETON and assisted in the purchase, receipt and sale of contraband cigarettes supplied by the Organization. LEONE also trafficked in counterfeit cigarettes.

15.   FERNANDO ORTIZ was an employee of an El Paso, Texas, Customs bonded warehouse company. Ortiz' role in the Organization was to coordinate and direct the diversion of contraband cigarettes from USCS in-bond status.

16.   ANTONIO ARANDA worked in a supervisory position at an El Paso, Texas, transportation company and provided the Organization with transportation services for large quantities of contraband and counterfeit cigarettes.

17.   SAUL IGLESIAS was an employee of an El Paso, Texas, transportation company who aided and abetted the Organization in transporting a load of contraband cigarettes.

18.   A container is a reference to an instrument similar to a trailer, in its use and configuration, for the transport of bulk cargo and is capable of transporting up to 1,000 cases of cigarettes.

19.   A "case" of "contraband" cigarettes contains 50 cartons of cigarettes. A carton of cigarettes contains ten packages. Each package contains 20 individual cigarettes. Therefore, one case

of contraband cigarettes typically contains 10,000 individual cigarettes.

20. A "case" of "counterfeit"cigarettes typically contains 60 cartons of cigarettes. A carton of cigarettes contains ten packages. Each package contains 20 individual cigarettes. Therefore, one case of counterfeit cigarettes typically contains 12,000 individual cigarettes.

21. Contraband cigarettes is statutorily defined to mean a quantity in excess of 60,000 cigarettes (generally six cases of cigarettes) which bear no evidence of the payment of applicable State cigarette taxes in the State where such cigarettes are found, if such state requires a stamp, impression or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes ... Title 18 U.S.C. § 2341(2).

22. According to the Bureau of Alcohol, Tobacco, and Firearms (ATF), all the States discussed in this indictment whose cigarette taxes were not paid, namely: Texas, California and New York, required a state cigarette tax stamp on the cigarette packages. Also, according to ATF, every state in the United States imposes a state tax on cigarettes.

23. In 2002, the State cigarette tax on cigarettes sold in Texas was 41cents per package. Therefore, the taxes on a case of contraband cigarettes if sold in the State of Texas would equal $ 205.00 and the taxes on a case of counterfeit cigarettes if sold in the State of Texas would equal $246.00.

24. In 2002, the State cigarette tax on cigarettes sold in California was 87 cents per package. Therefore, the taxes on a case of contraband cigarettes if sold in the State of California would equal $435.00 and the taxes on a case of counterfeit cigarettes if sold in the State of California would equal $522.00.

25. In 2002, the State cigarette tax on cigarettes sold in New York was one dollar and fifty cents per package. Therefore, the taxes on a case of contraband cigarettes if sold in the State of New York would equal $750.00 and the taxes on a case of counterfeit cigarettes if sold in the State of New York would equal $900.00.

26. A counterfeit trademark is a spurious (false, non-genuine) trademark, which is identical to, or substantially indistinguishable from a federally registered trademark. Title 15 U.S.C. § 1127.

27. "Marlboro," "Marlboro Lights," and "Marlboro Menthols"are each a trademark registered with the U.S. Patent and Trademark Office.

In 2002, the retail value of legitimate Marlboro's and Marlboro Lights in the State of Texas was approximately $1,689.00 a case.

In 2002, the retail value of legitimate Marlboro's and Marlboro Lights in the State of

California was approximately $1,919.00 a case.

In 2002, the retail value of legitimate Marlboro's, Marlboro Lights and Marlboro Menthol in the State of New York was approximately $2,234.00 a case.

28.   The Organization referred to counterfeit cigarettes, cigarettes bearing a counterfeit trademark, in coded language and called them among other things: "Chinos" (a reference to their Chinese origin), "Miles" (a reference to a marketing promotion for cigarettes legitimately sold in the U.S.), "Pirated and/or Pirates," "Number Twos" and "domestics."

Additionally, they also referred to contraband cigarettes in coded language as among other things: "made under authority," "duty free," and "U.S. Blend."

29.   "Excise tax" refers to a federal or state tax imposed on the manufacture and distribution of certain non-essential consumer goods, such as cigarettes.

30.   A "duty" refers to, among other things, a tax on imported merchandise.

31.   The contraband cigarettes, which are the subject of this indictment, entered the United States through the in-bond system. The in-bond system involves cargo entering the United States without appraisal of value or payment of duties. An in-bond entry is required when cargo transits to another U.S. location for formal entry, transits the U.S. destined to another country, or is immediately exported. 19 C.F.R. § 10.31 and Part 18. For example, under the "in-bond system," cargo can originate from China, enter in-bond through Los Angeles, California, and transit in-bond to El Paso, Texas, and then can be exported to Mexico. Many of the cigarettes, discussed in this indictment, instead of being exported from the United States were diverted and sold in various cities of the United States without payment of the applicable state and federal cigarette taxes and USCS duties.

32.   "In Bond" refers to the status of merchandise admitted provisionally into the country without payment of duties, either for storage in a bonded warehouse or for trans-shipment to another point, where duties will eventually be imposed or from where the merchandise will be exported.

33.   "Bonded Warehouse" refers to a warehouse authorized by USCS for storing merchandise on which payment of duties is deferred until the importer pays the duties or until USCS releases the merchandise.

34.   "Bonded Merchandise" is any foreign product, good and commodity that is allowed to enter the United States in "in bond" status.

35.   "Customs Broker" refers to the importer's agent, licensed by USCS, to enter and clear goods through USCS.

36.  "Bill of Lading" refers to a document that a transportation company possesses, acknowledging that it has received goods, which temporarily serves as the title during the transport of the merchandise.

37.  "Foreign Trade Zone" (FTZ) is a restrictive access site, in or adjacent to a port of entry and used to expedite and encourage foreign commerce and other purposes. Any goods in a FTZ are not considered to be in the commerce of the United States.

38.  A USCS Form 7512 is a multiple use document used for "T & E", a Transportation and Exportation document, "I.E.", an Immediate Exportation document, and "I.T.", an Immediate Transportation entry document.

39.  "T & E" refers to a USCS Transportation and Exportation document, which allows for the movement of bonded merchandise from a point of departure to the port for release to be exported out of the United States.

40.  "I.E." refers to a USCS Immediate Exportation entry document, which allows for foreign merchandise arriving at one U.S. port to be exported from the same port without payment of duty.

41.  "I.T."refers to a USCS Immediate Transportation entry document, which allows foreign merchandise arriving at one U.S. port to be transported in-bond to another U.S. port where a superseding entry will be filed by the broker or importer.

42.  "Pedimento" refers to an official Mexican document which allows for the importation and exportation of merchandise, upon compliance with Mexican customs law.

43.  The Republic of Mexico has stringent requirements for the importation of cigarettes. According to Mexican Customs, an importer of cigarettes into Mexico must make an application and have the application approved by the Mexican Government. The importer needs to belong to the Importers Census List. There is a list of authorized Mexican Customs ports of entry for cigarettes. The list includes the following ports: Cancun, Ciudad Hidalgo, Colombia, Manzanillo, Nuevo Laredo, Subteniente Lopez, Tijuana, Veracruz, and Aeropuerto Internacional de Mexico/International Airport in Mexico City.

Ciudad Juarez is not an authorized port of entry for cigarettes. All cigarettes imported into Mexico are subject to a tax of approximately two hundred and fifty percent (250%).

## COUNT ONE
### [18 U.S.C. §§ 371, 545, 2342 (a), 2320(a), 1343 & 1341]
### Conspiracy to Smuggle Cigarettes into the United States, Traffic in Contraband Cigarettes, Traffic in Counterfeit Cigarettes, Commit Wire Fraud and Commit Mail Fraud

The Grand Jury re-alleges and incorporates the Introduction as if fully set out herein.

Beginning on or about July 2000, and continuing through and including on or about July 2003, in the Western District of Texas, the Southern District of California, the Central District of California, the Western District of New York, the Southern District of Texas, the District of New Jersey, the Southern District of Florida, the Republic of Mexico, Taiwan, and elsewhere, the Defendants,

JORGE ABRAHAM,
FELIPE CASTANEDA,
IGNACIO ABRAHAM,
SERGIO NAJERA-DIAZ,
PABLO MAURICIO FLORES -RIOS,
MARIO LUEVANO-GARCIA,
OSCAR CESAR GARCIA JAQUEZ,
OMAR JARAMILLO,
LORENZO ENRIQUE CAMPOS,
DEAN MILLER,
ROBERT TARANTINO,
SCOTT SNYDER,
TIMOTHY J. FARNHAM,
DONALD DELAND,
PETER L. PEMBLETON,
ANTHONY LEONE,
FERNANDO ORTIZ,
ANTONIO ARANDA and
SAUL IGLESIAS,

knowingly and wilfully did combine, conspire, confederate and agree together, and with each other, with other unindicted co-conspirators, and with others both known and unknown to the grand jury, to commit the following offenses against the United States, that is:

1.)     to fraudulently and knowingly import and bring into the United States merchandise, namely, contraband and counterfeit cigarettes, contrary to law, and receive, conceal, buy, sell and facilitate the transportation, concealment and sale of such contraband and counterfeit

8

cigarettes after importation, knowing the contraband and counterfeit cigarettes to have been imported and brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545;

2.) to unlawfully and knowingly ship, transport, receive, possess, sell, distribute and purchase contraband cigarettes, as that term is defined in Title 18, United States Code, Section 2341(2), namely: a quantity in excess of 60,000 cigarettes, which bear no evidence of the payment of applicable State cigarette taxes in the State where such cigarettes are found, namely the States of Texas, California, and New York, and said States require a stamp, impression and other indication to be placed on packages of cigarettes to evidence the payment of cigarette taxes, in violation of Title 18, United States Code, Section 2342(a);

3.) to intentionally traffic and attempt to traffic in goods, namely, cigarettes, and did knowingly use a counterfeit mark on and in connection with such cigarettes, in violation of Title 18, United States Code, Section 2320(a);

4.) to knowingly devise and intend to devise a scheme and artifice to defraud the states of Texas, California and New York, and the USCS of all applicable duties and taxes for cigarettes, both contraband and counterfeit, and for the purpose of executing and attempting to execute such scheme and artifice, they did transmit and cause to be transmitted by means of a wire communication, namely a telephonic conversation, in interstate and foreign commerce, certain signs, signals and sounds, which wire communication related to the shipment, transport, receipt, possession, sale, distribution and purchase of contraband and counterfeit cigarettes, in violation of Title 18, United States Code, Section 1343; and

5.) to knowingly devise and intend to devise a scheme and artifice to defraud the states of Texas,

California and New York, and the USCS of all applicable duties and taxes for cigarettes, both contraband and counterfeit, and for the purpose of executing and attempting to execute such scheme and artifice to knowingly cause to be sent, delivered and moved by the Postal Service and a commercial interstate carrier, namely:  FedEx and DHL, according to the directions thereon, a matter and thing, namely: samples of contraband and counterfeit cigarettes and documents, to use in defrauding the states of Texas, California and New York, and the USCS, in violation of Title 18, United States Code, Section 1341.

## MANNER AND MEANS OF THE CONSPIRACY
## AND SCHEME AND ARTIFICE TO DEFRAUD

The Defendants used the following means for the purpose of furthering the objects of the conspiracy, and for the purpose of executing the scheme and artifice to defraud:

The Defendants trafficked in counterfeit and contraband cigarettes. The Defendants did not pay the applicable taxes to the states of Texas, California and New York, and the duties and taxes to USCS on the contraband and counterfeit cigarettes.

The Defendants purchased the counterfeit cigarettes from manufacturers in the Far East, namely China and Taiwan.  The Defendants paid for the counterfeit cigarettes with funds which were wire transferred within the United States and from the United States to Taiwan.  Further, the Defendants used wire communications, including telephonic and facsimile communications, to facilitate the purchase, shipment and delivery of counterfeit cigarettes.  The counterfeit cigarettes were then shipped on international waters, by containers on ships, from the Far East to the United States. The counterfeit cigarettes arrived at the port of entry in Long Beach, California, among other places.  To prevent the detection of the shipment as counterfeit cigarettes by the USCS, the

Defendants caused the shipment to be manifested as other merchandise, for example "toys" and "plastic goods." When the counterfeit cigarettes arrived at the port of entry, the counterfeit cigarettes were unloaded, smuggled and distributed in the United States.

The Defendants also shipped, transported, received, possessed, sold, distributed and purchased contraband cigarettes. The Defendants obtained the contraband cigarettes from Customs brokers, in El Paso, Texas, and Miami, Florida, who were authorized to possess cigarettes which were in "in-bond" status. The Defendants paid for the contraband cigarettes with funds from their bank accounts. Further, the Defendants used wire communications, including telephonic and facsimile communications, to facilitate the trafficking of contraband cigarettes. The Defendants, after obtaining possession of the cigarettes from the brokers, would remove the cigarettes from "in-bond" status, contrary to law, and smuggle the cigarettes to New York and California and into the commerce of the United States for distribution. The Defendants from New York paid for the contraband cigarettes with funds which were wire transferred from banks in New York to banks in El Paso, Texas and the Republic of Mexico.

The Defendants attempted to manipulate and manipulated the USCS in-bond system. The Defendant attempted to achieve this by making false and material statements and representations to USCS, by presenting altered and falsified documents, and by submitting fraudulent "pedimentos" to USCS. These documents reflected that the contraband cigarettes had been exported from the United States to Mexico when in truth the contraband cigarettes had been smuggled and introduced into the commerce of the United States. The various documents used by the Defendants were intended to convince anyone who inspected these documents and any cigarette inventory associated with these documents to believe that duties and taxes were not due and owing to the USCS, and the

11

states of Texas, California and New York.

Further, the Defendants used the services of commercial carriers, such as FedEx and DHL, and the United States Postal Service to send the documents necessary for the Organization to deceive the USCS and samples of counterfeit cigarettes.

## OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, at least one of the co-conspirators herein committed one or more of the following overt acts, among others, in the Western District of Texas, the Southern District of California, the Central District of California, the Western District of New York, the Southern District of Texas, the District of New Jersey, the Southern District of Florida, the Republic of Mexico, Taiwan and elsewhere:

1. On or about July 11, 2000, **JORGE ABRAHAM** opened a bank account in El Paso, Texas, in the name of Sun City Abraham Transportation Inc., dba, Sun City Trucking.

2. On or about December 7, 2000, **JORGE ABRAHAM** opened a bank account in El Paso, Texas, in the name of Sun City Abraham Transportation Inc., listing the president as **JORGE ABRAHAM**, and using social security account number 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.

3. On or about April 2001, **JORGE ABRAHAM** contracted with an unindicted co-conspirator to manage a warehouse in Los Angeles, California, for the storage and distribution of cigarettes. **JORGE ABRAHAM** paid the unindicted co-conspirator a bi-weekly salary of $1,500.00.

4. On or about July 5, 2001, paperwork was filed in Los Angeles County California Fictitious Business Names records, registering "A Transport Trading Company Inc." in the county records, with a listed address of 820 S. Santa Fe Avenue, Los Angeles, California, for the warehouse discussed in the previous overt act.

5. On or about August 2001, **IGNACIO ABRAHAM** traveled to Los Angeles, California, to collect payment for cigarettes (contraband) previously shipped to an unindicted co-conspirator.

12

6.    On or about August 27, 2001, **IGNACIO ABRAHAM** made a deposit of $67,500.00 to his bank account in El Paso, Texas.

7.    On or about August 28, 2001, a wire transfer in the amount of $67,000.00 was made by **IGNACIO ABRAHAM** from a bank account in El Paso, Texas, to a bank account of a Miami, Florida, supplier of bonded merchandise.

8.    On or about September 8, 2001, a car rental company in Los Angeles, California, was paid $373.72 from **IGNACIO ABRAHAM's** bank account in El Paso, Texas.

9.    On or about September 10, 2001, **IGNACIO ABRAHAM** made deposits of $50,000.00 and $10,000.00 to his bank account in El Paso, Texas.

10.   On or about September 11, 2001, a wire transfer in the amount of $60,000.00 was made by **IGNACIO ABRAHAM**, from a bank account in El Paso, Texas, to a bank account of a Miami, Florida, supplier of bonded merchandise.

11.   On or about September 13, 2001, **IGNACIO ABRAHAM** made a deposit of $48,000.00 to his bank account in El Paso, Texas.

12.   On or about September 13, 2001, a wire transfer in the amount of $48,000.00 was made by **IGNACIO ABRAHAM** from a bank account in El Paso, Texas, to a bank account of a Miami, Florida, supplier of bonded merchandise.

13.   On or about September 22, 2001, a hotel in Los Angeles, California, was paid $213.79 from **IGNACIO ABRAHAM's** bank account in El Paso, Texas.

14.   On or about September 28, 2001, **JORGE ABRAHAM** sent a shipment of approximately 400 cases of contraband cigarettes to an unindicted co-conspirator in Los Angeles, California.

15.   Beginning on or about October 9, 2001 and continuing through and including on or about October 13, 2001, **IGNACIO ABRAHAM** was registered at a hotel in Los Angeles, California.

16.   On or about October 26, 2001, a check in the amount of $17,095.00 was issued from the checking account of **IGNACIO ABRAHAM**, and his wife,

13

in El Paso, Texas, made payable to an El Paso, Texas, supplier of bonded merchandise.

17. On or about February 11, 2002, a check in the amount of $19,960.00 was issued from the checking account of Sun City Abraham Transportation Inc., which is a bank account of **JORGE ABRAHAM**, made payable to an El Paso, Texas, supplier of bonded merchandise.

18. On or about March 24, 2002, **JORGE ABRAHAM** opened a bank account in the name of **GEORGE ABRAHAM**, using social security account number 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, in Los Angeles, California.

19. On or about March 27, 2002, **JORGE ABRAHAM** issued a check in the amount of $205,000.00 made payable to an El Paso, Texas, supplier of bonded merchandise.

20. On or about April 4, 2002, an international wire transfer in the amount of $80,000.00 was made by **JORGE ABRAHAM**, from a bank account in El Paso, Texas, to a bank account in Taiwan.

21. On or about April 5, 2002, an international wire transfer in the amount of $50,000.00 was made by **JORGE ABRAHAM**, from a bank account in El Paso, Texas, to a bank account in Taiwan.

22. On or about April 9, 2002, **JORGE ABRAHAM** issued a check in the amount of $125,990.00 made payable to an El Paso, Texas, supplier of bonded merchandise.

23. On or about May 2, 2002, in the state of New York, **PETER L. PEMBLETON** and **ANTHONY LEONE** accepted delivery of a shipment of 140 cases of contraband cigarettes sent by Organization from El Paso, Texas.

24. On or about May 17, 2002, a tractor trailer containing 553 cases of contraband cigarettes was escorted to an El Paso, Texas, freight company by a maroon van occupied by **SERGIO NAJERA-DIAZ** and **OSCAR CESAR GARCIA JAQUEZ**. The van was found to contain one case of contraband cigarettes.

25. On or about June 18, 2002, **IGNACIO ABRAHAM** checked into a hotel in Dunkirk, New York.

26. On or about June 20, 2002, in the state of New York, **PETER L. PEMBLETON** and **ANTHONY LEONE** accepted delivery of a shipment

14

of 100 cases of contraband cigarettes sent by the Organization from Laredo, Texas.

27.   On or about June 20, 2002, in the state of New York, **TIMOTHY J. FARNHAM, DONALD DELAND** and **SCOTT SNYDER** accepted delivery of a shipment of 169 cases of contraband cigarettes sent by the Organization from Laredo, Texas.

28.   On or about July 1, 2002, **IGNACIO ABRAHAM** and **FELIPE CASTANEDA** traveled to Buffalo, New York.

29.   On or about July 1, 2002, a charge in the amount of $410.10 was made to the bank card of **IGNACIO ABRAHAM** at a hotel in Dunkirk, New York.

30.   On or about July 16, 2002, **IGNACIO ABRAHAM** traveled to Dunkirk, New York.

31.   On or about July 17, 2002, a check in the amount of $65,025.00 was issued from a checking account of **GEORGE ABRAHAM**, made payable to an El Paso, Texas, supplier of bonded merchandise.

32.   On or about July 17, 2002, a check in the amount of $50,000.00 was issued from a checking account of **GEORGE ABRAHAM**, made payable to an El Paso, Texas, supplier of bonded merchandise.

33.   On or about July 18, 2002, **JORGE ABRAHAM** telephonically contacted **DEAN MILLER** to discuss the status of a container (of counterfeit cigarettes).

34.   On or about July 19, 2002, **JORGE ABRAHAM** telephonically contacted **ROBERT TARANTINO** to discuss the status of a container (of counterfeit cigarettes).

35.   On or about July 19, 2002, a wire transfer in the amount of $48,400.00 was made or was caused to be made by **SCOTT SNYDER**, dba, Iroquois Tobacco Company, from New York to El Paso, Texas, to the account of Sun City Abraham Transportation, which is a bank account of **JORGE ABRAHAM**.

36.   On or about July 20, 2002, in the State of New York, **PETER L. PEMBLETON** and **ANTHONY LEONE** accepted delivery of a shipment of 200 cases of contraband cigarettes sent by the Organization from El Paso, Texas.

15

37.     On or about July 20, 2002, in the State of New York, **TIMOTHY J. FARNHAM, DONALD DELAND** and **SCOTT SNYDER** accepted delivery of a shipment of 100 cases of contraband cigarettes sent by the Organization from El Paso, Texas.

38.     On or about July 20, 2002, in the state of New York, **TIMOTHY J. FARNHAM, SCOTT SNYDER** and **DONALD DELAND** loaded a vehicle with 208 half cases, which contained 30 cartons per case, of counterfeit "Marlboro Lights" cigarettes.

39.     On or about July 20, 2002, in the state of New York, **TIMOTHY J. FARNHAM, SCOTT SNYDER** and **DONALD DELAND** loaded a vehicle with 14 cases, which contained 60 cartons per case, of counterfeit "Marlboro" cigarettes.

40.     On or about July 21, 2002, **ROBERT TARANTINO** telephonically contacted **JORGE ABRAHAM** to inform him that the Irvine (California) Police Department had seized the container (which consisted of 748 cases of counterfeit "Marlboro" cigarettes).

41.     On or about July 22, 2002, **JORGE ABRAHAM** shipped to an unindicted co-conspirator in the State of California, a shipment of over 200 cases of contraband cigarettes. These cigarettes were sent from El Paso, Texas.

42.     On or about July 22, 2002, **SERGIO NAJERA-DIAZ** provided **JORGE ABRAHAM** with the shipment tracking number for the contraband cigarettes destined for California.

43.     On or about July 24, 2002, **DEAN MILLER** and **JORGE ABRAHAM** telephonically discussed the wire transfer of the "first $25,000.00."

44.     On or about July 24, 2002, **ROBERT TARANTINO** telephonically contacted **JORGE ABRAHAM** to learn whether **ABRAHAM** had sent him the "six sheets of paper" ($6,000.00).

45.     On or about July 25, 2002, **TIMOTHY J. FARNHAM** telephonically told **JORGE ABRAHAM** he had just sent **JORGE ABRAHAM** another 51 ($51,000.00).

46.     On or about July 25, 2002, **JORGE ABRAHAM** telephonically told **TIMOTHY J. FARNHAM** that he owed **ABRAHAM** 450 ($450,000.00) or 430 ($430,000.00) for the "Duty Free" (contraband cigarettes) and the

"domestics" (counterfeit cigarettes) **ABRAHAM** had previously sent him.

47.   On or about July 26, 2002, in the state of New York, **PETER L. PEMBLETON** and **ANTHONY LEONE** accepted delivery of a shipment of 300 cases of contraband cigarettes sent by the Organization from El Paso, Texas.

48.   On or about July 26, 2002, in the state of New York, **DONALD DELAND** and **SCOTT SNYDER** accepted delivery of a shipment of 300 cases of contraband cigarettes sent by the Organization from El Paso, Texas.

49.   On or about July 26, 2002, **MARIO LUEVANO-GARCIA** obtained a "pedimento" in Mexico to be used to deceive USCS and facilitate the smuggling and distribution of cigarettes.

50.   On or about July 27, 2002, **JORGE ABRAHAM** telephonically instructed **ANTONIO ARANDA** to falsify a bill of lading for the Organization.

51.   On or about July 27, 2002, **OSCAR CESAR GARCIA JAQUEZ** delivered a check in the amount of $1,400.00 as payment to **ANTONIO ARANDA** for transportation services of 300 cases of contraband cigarettes.

52.   On or about July 28, 2002, **ROBERT TARANTINO** telephonically contacted **JORGE ABRAHAM** and offered to broker the return of the seized container (of counterfeit cigarettes) in Irvine, California, for "65".

53.   On or about July 29, 2002, **DEAN MILLER** telephonically contacted **JORGE ABRAHAM** to inform him that the shipping company needed a contact telephone number.

54.   On or about July 30, 2002, **ANTHONY LEONE** and **JORGE ABRAHAM** telephonically discussed the availability of "Miles" (counterfeit cigarettes).

55.   On or about July 30, 2002, **DEAN MILLER** telephonically told **JORGE ABRAHAM** that the air bill was being sent by overnight express (FedEx) to the Leo Collins address and that it should arrive the following day.

56.   On or about July 30, 2002, **ANTHONY LEONE** telephonically told **JORGE ABRAHAM** he had wire transferred $56,000.00 to the new account.

57.   On or about July 31, 2002, **TIMOTHY J. FARNHAM** telephonically told **JORGE ABRAHAM** he had put 38 ($38,000.00) in **ABRAHAM's** account and would send more tomorrow.

17

58.   On or about July 31, 2002, **ANTHONY LEONE** telephonically told **JORGE ABRAHAM** that the 373 ($373,000.00) had already been sent to **ABRAHAM**.

59.   On or about July 31, 2002, **JORGE ABRAHAM** telephonically contacted **DEAN MILLER** to discuss the possibility of re-routing the container (of counterfeit cigarettes) from Long Beach, California, to New Jersey.

60.   On or about July 31, 2002, **JORGE ABRAHAM** telephonically contacted a representative of a shipping company and requested that the container (of counterfeit cigarettes) be re-routed to Shanghai, China.

61.   On or about July 31, 2002, **DEAN MILLER** telephonically contacted **JORGE ABRAHAM** to confirm the receipt of a FedEx package which contained an original bill of lading and a commercial invoice for a shipment of 950 cases of "toys" (counterfeit cigarettes).

62.   On or about July 31, 2002, **JORGE ABRAHAM** telephonically contacted **DEAN MILLER** to inform him that he was having the container (of counterfeit cigarettes) shipped back to Shanghai, China, and **JORGE ABRAHAM** told **DEAN MILLER** he was doing this to avoid inspection (by USCS) and further admitted to **DEAN MILLER** that he lied to the representative of the shipping company.

63.   On or about July 31, 2002, **JORGE ABRAHAM** telephonically told **ROBERT TARANTINO** that he would send the "fax" when he received the FedEx package containing the bill of lading.

64.   On or about July 31, 2002, **FELIPE CASTANEDA** telephonically asked an unindicted co-conspirator if he could have his DHL account number again so he could ship samples (of counterfeit and contraband cigarettes).

65.   On or about August 1, 2002, **IGNACIO ABRAHAM** telephonically instructed an unindicted co-conspirator to contact him when he received the samples (of counterfeit and contraband cigarettes).

66.   On or about August 1, 2002, **DEAN MILLER** telephonically told **JORGE ABRAHAM** to FedEx to **MILLER** originals of all the paperwork (of the counterfeit cigarettes manifested as toys).

67.   On or about August 1, 2002, **TIMOTHY J. FARNHAM** telephonically told **JORGE ABRAHAM** that he would have 120 ($120,000.00) in

18

ABRAHAM's account by tomorrow morning, and **ABRAHAM** said he had another order (of cigarettes) ready, but could not send it until **FARNHAM** paid (for a previous shipment).

68.   On or about August 1, 2002, **TIMOTHY J. FARNHAM** telephonically told **JORGE ABRAHAM** he had a buyer in New York for some "product, domestics" (counterfeit cigarettes) and **ABRAHAM** stated he was getting those (counterfeit cigarettes), "maybe next week".

69.   On or about August 1, 2002, **JORGE ABRAHAM** telephonically informed **TIMOTHY J. FARNHAM** about two containers (of counterfeit cigarettes) that had been held in California.

70.   On or about August 1, 2002, **TIMOTHY J. FARNHAM** and **JORGE ABRAHAM** telephonically discussed the progress in establishing an internet site for the purpose of distributing "duty frees" (contraband cigarettes) and "domestics" (counterfeit cigarettes).

71.   On or about August 5, 2002, **ANTHONY LEONE** and **JORGE ABRAHAM** telephonically discussed **LEONE** wiring 25 ($25,000.00).

72.   On or about August 5, 2002, an unindicted co-conspirator telephonically asked **JORGE ABRAHAM** if he had those DHL numbers so he could "track down" the cigarettes ( samples of counterfeit and contraband cigarettes).

73.   On or about August 14, 2002, **JORGE ABRAHAM** telephonically contacted **SCOTT SNYDER** and discussed the next shipment of contraband cigarettes and how to defeat detection of their scheme by USCS, namely shipping everything in-bond and clearing them at a location where the arrangements had been "fixed."

74.   On or about August 19, 2002, **JORGE ABRAHAM** telephonically told **ANTHONY LEONE** to begin sending all wires (wire transfers of funds) to a bank account in Mexico.

75.   On or about August 19, 2003, **ANTHONY LEONE** telephonically told **JORGE ABRAHAM** he needed "Product" (contraband cigarettes).

76.   On or about August 20, 2002, **TIMOTHY J. FARNHAM** telephonically told **JORGE ABRAHAM** that after he sells the cigarettes he wires the money to **JORGE ABRAHAM**.

77.   On or about August 20, 2002, **JORGE ABRAHAM** telephonically told

19

TIMOTHY J. FARNHAM he was going to "fax" the wiring information so that FARNHAM could send (wire transfer) the money to Mexico.

78. On or about August 21, 2002, **LORENZO ENRIQUE CAMPOS** contacted USCS officials in an attempt to secure the release of 300 cases of contraband cigarettes seized from the Organization.

79. On or about August 22, 2002, **IGNACIO ABRAHAM** and **FELIPE CASTANEDA** traveled to Buffalo, New York.

80. On or about August 22, 2002, a charge in the amount of $238.33 was made to the bank card of **IGNACIO ABRAHAM** at a hotel in Dunkirk, New York.

81. On or about August 22, 2002, in the state of New York, **ANTHONY LEONE** and **PETER L. PEMBLETON** accepted delivery of a shipment of 310 cases of contraband cigarettes sent by the Organization from El Paso, Texas.

82. On or about August 22, 2002, in the state of New York, **DONALD DELAND, TIMOTHY J. FARNHAM** and **SCOTT SNYDER** accepted delivery of a shipment of 306 cases of contraband cigarettes sent by the Organization from El Paso, Texas.

83. On or about August 22, 2002, **JORGE ABRAHAM** and **ANTHONY LEONE** telephonically discussed how much money to send to Mexico City.

84. On or about August 22, 2002, **PETER PEMBLETON** obtained a cashier's check in the amount of $3,000.00, made payable to **IGNACIO ABRAHAM.**

85. On or about August 23, 2002, **JORGE ABRAHAM** telephonically told **ROBERT TARANTINO** that he would let him talk to **FERNANDO ORTIZ** so that **ORTIZ** could explain what (documents) **ABRAHAM** needed.

86. On or about August 23, 2002, **FERNANDO ORTIZ** telephonically told **ROBERT TARANTINO** that he needed a USCS Form "7512," and another form, the T & E, since **ROBERT TARANTINO** had not sent what **JORGE ABRAHAM** needed.

87. On or about August 26, 2002, **MARIO LUEVANO-GARCIA** obtained a copy of the "pedimento" initially obtained on or about July 26, 2002, to be used to deceive USCS and facilitate the smuggling of cigarettes.

20

88.    On or about August 26, 2002, **JORGE ABRAHAM** and **DEAN MILLER** telephonically discussed ordering another container (of counterfeit cigarettes) from an unindicted co-conspirator in the Far East and each paying $80,000.00 for the container.

89.    On or about August 27, 2002, **JORGE ABRAHAM** telephonically contacted **ROBERT TARANTINO** and instructed him to send the package to: "Attention: Enrique ... El Paso, Texas, 79902."

90.    On or about August 27, 2002, **ROBERT TARANTINO** telephonically told **JORGE ABRAHAM** that he needed a last name and **ABRAHAM** said "CAMPOS."

91.    On or about August 27, 2002, **ROBERT TARANTINO** telephonically told **JORGE ABRAHAM** that they were going to be using "overnight."

92.    On or about August 27, 2002, **ROBERT TARANTINO** telephonically described to **JORGE ABRAHAM** what was being sent, namely: "*Transportation Entry and Manifest of Goods Subject to Customs Inspection and Permit*," and a "dock receipt."

93.    On or about August 27, 2002, **ROBERT TARANTINO** sent through the U.S. Postal Service an "Express Mail" package, addressed to "**ENRIQUE CAMPOS...**" *to the address previously provided by* **JORGE ABRAHAM**.

94.    On or about August 27, 2002, **JORGE ABRAHAM** telephonically told **DEAN MILLER** he wanted "all reds" (counterfeit "Marlboro" cigarettes) and "no Lights" (counterfeit "Marlboro Lights") and to make sure they were "*updated*." (*The reference to "updated" is to the latest packaging that Philip Morris is utilizing*).

95.    On or about August 27, 2002, **FELIPE CASTANEDA** telephonically contacted **SAUL IGLESIAS** to arrange transportation services for cigarettes (*751 cases of contraband cigarettes*).

96.    On or about August 29, 2002, **ANTHONY LEONE** telephonically told **JORGE ABRAHAM** that **PETER L. PEMBLETON** had wired 59 ($59,000.00) today.

97.    On or about August 29, 2002, **SCOTT SNYDER** telephonically asked **JORGE ABRAHAM** if it was 438,000 ($438,000.00) that they owed.

98. On or about August 29, 2002, **SCOTT SNYDER** telephonically told **JORGE ABRAHAM** that **FARNHAM** was responsible for wiring the money derived from **SNYDER's** and **DELAND's** sales.

99. On or about August 29, 2002, **JORGE ABRAHAM** telephonically told **SCOTT SNYDER** that they needed to get the money owed to him because he, **ABRAHAM**, had a container of "Miles" (counterfeit cigarettes) coming within 10 days.

100. On or about August 30, 2002, a check in the amount of $71,312.50 was issued from a checking account of Sun City Abraham Transportation, Inc., which is a bank account of **JORGE ABRAHAM**, made payable to an El Paso, Texas, supplier of bonded merchandise.

101. On or about August 30, 2002, **SCOTT SNYDER** telephonically told **JORGE ABRAHAM** that he had just wired another 42,000 ($42,000.00).

102. On or about September 2, 2002, an "Express Mail" package, from **ROBERT TARANTINO**, was delivered to an El Paso, Texas, address provided by **JORGE ABRAHAM**. The package contained: a blank USCS Form 7512, a completed 7512 with the class of entry "T.E.", a "dock receipt" and other forms.

103. On or about September 3, 2002, **SCOTT SNYDER** telephonically told **JORGE ABRAHAM** that they still had "Marlboro Menthols," (counterfeit) because they could not sell them; **SNYDER** added they were no good and it would take a while to get rid of them.

104. On or about September 3, 2002, **SCOTT SNYDER** telephonically asked **JORGE ABRAHAM** how much they were supposed to wire and **ABRAHAM** said that they were supposed to wire 70 or 80 ($70,000.00 or $80,000.00).

105. On or about September 4, 2002, **JORGE ABRAHAM** telephonically asked **MAURICIO FLORES-RIOS** for the total (total deposits) and **FLORES-RIOS** said that until the previous day it was 244,890 ($244,890.00).

106. On or about September 4, 2002, **MAURICIO FLORES-RIOS** telephonically told **JORGE ABRAHAM** that there were five deposits and he would read them out to **ABRAHAM**. The first one (deposit) was $40,987. **ABRAHAM** instructed **FLORES-RIOS** to put it under "The Italian" (**ANTHONY LEONE**). The second one (deposit) was $77,907.00. **ABRAHAM** said it was from "Güero" (**TIMOTHY J. FARNHAM**). The third one (deposit) was $58,987.00. **ABRAHAM** said it was from "The

22

Italian" (ANTHONY LEONE). The fourth one (deposit) was $24,987.00. ABRAHAM said it was from "The Italian" (ANTHONY LEONE). The fifth one (deposit) was $42,022.00. ABRAHAM said it was from FARNHAM.

107.   On or about September 4, 2002, MAURICIO FLORES-RIOS telephonically told JORGE ABRAHAM he would identify each (payment) and mark them off.

108.   On September 5, 2002, JORGE ABRAHAM telephonically asked SCOTT SNYDER how much they wired after the 14,000 ($14,000.00) on 8/22 (August 22nd). SNYDER said that on 8/26 (August 26th) a bank in New York received $77,920.00, on 8/30 (August 30th), $42,035.00 was wired to ABRAHAM in Mexico City, and on 9/4 (September 4th) $4,300.00. SNYDER repeated the information and then included a transaction on 8/27 of $43,750.00, and changed the amount of 9/4 to $4,340.00. SCOTT SNYDER telephonically told JORGE ABRAHAM that on 8/12 (August 12th) $31,400.00 was sent to a bank in El Paso, Texas.

109.   On or about September 5, 2002, JORGE ABRAHAM telephonically told DONALD DELAND that with this system of "in-bond" they (contraband cigarettes) could be there in two days.

110.   On or about September 5, 2002, DONALD DELAND telephonically told JORGE ABRAHAM he had sent him $52,500.00 yesterday.

111.   On or about September 6, 2002, FELIPE CASTANEDA telephonically told MAURICIO FLORES-RIOS to go to the bank and get a cashier's check for $153,016.25.

112.   On or about September 6, 2002, JORGE ABRAHAM telephonically contacted TIMOTHY J. FARNHAM and informed him he had a new method of defeating the "in-bond" system.

113.   On or about September 6, 2002, IGNACIO ABRAHAM telephonically contacted a travel agency in reference to a flight to Buffalo, New York, for September 8, 2002.

114.   On or about September 6, 2002, FERNANDO ORTIZ telephonically told FELIPE CASTANEDA that he had some blank bills of lading that they could complete.

115.   On or about September 9, 2002, FELIPE CASTANEDA and FERNANDO

23

ORTIZ telephonically discussed completing paperwork for a shipment of contraband cigarettes. They discussed fictitious destinations to be included on the "T & E," in reference to 751 cases of contraband cigarettes. They discussed fictitious intended destinations as being: "Panama, Israel or wherever."

116. On or about September 9, 2002, in the conversation discussed in the previous overt act, **FELIPE CASTANEDA** instructed **FERNANDO ORTIZ** to put any destination he wanted. **FERNANDO ORTIZ** laughed and said he would just put a port.

117. On or about September 10, 2002, **SAUL IGLESIAS** telephonically told **FELIPE CASTANEDA** that they needed to make up a name for the destination of the shipment for the 751 cases of (contraband) cigarettes.

118. On or about September 10, 2002, **FELIPE CASTANEDA** telephonically told **SAUL IGLESIAS** that he would send him "five" for his help, in arranging the transportation for the 751 cases of contraband cigarettes.

119. On or about September 11, 2002, **SAUL IGLESIAS** telephonically told **FELIPE CASTANEDA** that the drivers were on the road now and that he had not given them the bills of lading, per **CASTANEDA's** previous request and instructions.

120. On or about September 11, 2002, **FELIPE CASTANEDA** telephonically contacted **JORGE ABRAHAM** to discuss when he could pick up bills of lading from **ABRAHAM's** home.

121. On or about September 11, 2002, **FELIPE CASTANEDA** and **JORGE ABRAHAM** telephonically discussed USCS Newark's request to inspect a shipment of cigarettes and to follow this shipment to the port of exit.

122. On or about September 11, 2002, **JORGE ABRAHAM** telephonically discussed and agreed with **FELIPE CASTANEDA** that the shipment of 751 cases should be returned and to not risk losing this shipment to USCS.

123. On or about September 11, 2002, **JORGE ABRAHAM** telephonically spoke to **ROBERT TARANTINO**. **TARANTINO** advised **ABRAHAM** to send the truck back (to El Paso) and not risk losing it (the shipment of cigarettes).

124. On or about September 13, 2002, **FELIPE CASTANEDA** telephonically instructed **SAUL IGLESIAS** to falsify a letter to be given to USCS.

125. On or about September 13, 2002, **SAUL IGLESIAS** sent via facsimile transmittal, the false letter discussed in the previous overt act, to "Sgt. Andrew Kulp, U.S. Customs, Newark, N.J." The letter stated in pertinent part: "This shipment was cancelled due to not being able to deliver on September 13, 2002."

126. On or about September 19, 2002, **FELIPE CASTANEDA** telephonically told **JORGE ABRAHAM** that **FERNANDO ORTIZ** should be the first to meet with USCS representatives in reference to the seizure of 959 cases.

127. On or about September 19, 2002, **FELIPE CASTANEDA** telephonically told **JORGE ABRAHAM** that **LORENZO ENRIQUE CAMPOS** would accompany **FERNANDO ORTIZ** to the interview with USCS, so that if things get out of hand, **CAMPOS** could stop the interview.      -

128. On or about September 24, 2002, **ANTHONY LEONE** telephonically stated to **JORGE ABRAHAM** he was trying to get rid of the "miles"(counterfeit cigarettes from a previous shipment).

129. On or about September 26, 2002, **ANTHONY LEONE** telephonically said to **JORGE ABRAHAM** they owed 75 ($75,000) which should clear everything up. **ABRAHAM** said he wanted the money to go to the account in Mexico.

130. On or about October 2, 2002, **JORGE ABRAHAM** telephonically spoke to **TIMOTHY J. FARNHAM** to discuss the procedure to be used for future shipments of cigarettes (contraband) to New York.

131. On or about October 2, 2002, **JORGE ABRAHAM** telephonically spoke to an El Paso, Texas, cigarette supplier concerning the acquisition of 500 cases of cigarettes (contraband).

132. On or about October 2, 2002, **JORGE ABRAHAM** and **TIMOTHY J. FARNHAM** telephonically discussed the procedure for removing the 500 cases (of contraband cigarettes) from the in-bond system.

133. On or about October 3, 2002, **IGNACIO ABRAHAM** and **MAURICIO FLORES-RIOS** traveled to New York to supervise the distribution and payment of the 500 cases of cigarettes (contraband).

134. On or about October 3, 2002, the Organization caused an I.T., to be filed with the USCS which reflected that 500 cases of cigarettes, "for export only" which originated in a Miami, Florida, FTZ, were destined for a bonded

warehouse in Buffalo, New York.

135. On or about October 3, 2002, **FELIPE CASTANEDA** asked **MAURICIO FLORES-RIOS** who he should talk to at a bank in Mexico.

136. Beginning on or about October 3, 2002 and continuing through and including on or about October 13, 2002, **IGNACIO ABRAHAM** rented a room at a hotel in Dunkirk, New York.

137. On or about October 8, 2002, **JORGE ABRAHAM** telephonically asked **ANTHONY LEONE** if he would wire the money to his American account.

138. On or about October 10, 2002, **IGNACIO ABRAHAM** telephonically told **JORGE ABRAHAM** that **DELAND** and **FARNHAM** should pay in advance before getting more product (contraband cigarettes).

139. Beginning on or about October 22, 2002 and continuing through and including on or about October 26, 2002, **IGNACIO ABRAHAM** leased a car, listing **FELIPE CASTANEDA** as an additional driver, from a car rental company at the Buffalo-Niagra International Airport, Buffalo, New York.

140. On or about October 22, 2002, **FELIPE CASTANEDA** and **IGNACIO ABRAHAM** went to a bonded warehouse in Buffalo, New York, where an employee of the warehouse was told that they, **CASTANEDA** and **ABRAHAM**, would return the next day with a driver (to remove the 500 cases of contraband cigarettes).

141. On or about October 24, 2002, **FELIPE CASTANEDA** and **IGNACIO ABRAHAM** went to a Buffalo, New York, warehouse where they attempted to secure the release of the 500 cases of cigarettes (contraband).

142. On or about October 24, 2002, the 500 cases of cigarettes were removed from the bonded warehouse in Buffalo, New York.

143. On or about December 17, 2002, **FELIPE CASTANEDA** solicited an El Paso, Texas, Customs licensed broker to assist in transporting cigarettes.

144. On or about December 20, 2002, **OSCAR GARCIA JAQUEZ** took possession of 50 cases of cigarettes (contraband).

145. On or about December 30, 2002, **JORGE ABRAHAM** solicited an El Paso, Texas, Customs licensed broker to assist in the movement of another shipment of cigarettes.

146.   On or about January 30, 2003, **FELIPE CASTANEDA** caused to be filed an affidavit with the USCS seeking the return of 751 cases of cigarettes (contraband) seized by USCS.

147.   On or about March 13, 2002, (sic 2003) **FELIPE CASTANEDA** *caused to be filed a letter with* "United States Customs Service Fines Penalties and Forfeitures Office" seeking the return of cigarettes.

148.   On or about July 28, 2003, **FELIPE CASTANEDA** caused to be filed a "Notice of Claim" for 751 cases of cigarettes and 720 bottles of liquor with USCS in El Paso, Texas.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO through FIFTEEN
### [18 U.S.C. §§ 2 & 545]
### Aiding and Abetting, and Smuggling Contraband and Counterfeit Cigarettes

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in

Count One as if fully set out herein.

On or about the dates alleged below, in the Western District of Texas, the Western District

of New York and elsewhere, the Defendants alleged below as principals, and aiders and abettors, did

fraudulently and knowingly import and bring into the United States, merchandise, namely contraband

and counterfeit cigarettes, in the amounts alleged below, contrary to law; and did fraudulently and

knowingly receive, conceal, buy and sell, and facilitate the transportation, concealment and sale of

merchandise, namely, contraband and counterfeit cigarettes, in the amounts alleged below, after

importation, knowing the contraband and counterfeit cigarettes to have been imported and brought

into the United States contrary to law, namely, the Defendants caused documents to be presented to

the USCS which falsely stated and represented the merchandise was to be exported from the United

27

States, when in fact, the merchandise was introduced into the commerce of the United States, failed

to file required Customs entry documents, and caused false invoices to be filed for counterfeit

merchandise arriving in the United States contrary to Title 18, United States Code, Section 1001, and

Title 19, United States Code, Sections 1481, 1484 and 1485:

| Count | Date(s) | Defendant(s) | Number of Cases and Cigarettes |
|-------|---------|--------------|-------------------------------|
| 2 | March 20, 2002 through May 7, 2002 | **JORGE ABRAHAM, FELIPE CASTANEDA, SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ, MARIO LUEVANO-GARCIA, PABLO MAURICIO FLORES -RIOS, PETER L. PEMBLETON, ANTHONY LEONE and FERNANDO ORTIZ** | 140 cases; 1,400,000 cigarettes |
| 3 | May 16 through 17, 2002 | **JORGE ABRAHAM, FELIPE CASTANEDA, SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ and FERNANDO ORTIZ** | 506 cases; 5,060,000 cigarettes |
| 4 | May 16 through 17, 2002 | **PETER L. PEMBLETON and ANTHONY LEONE** | 80 cases; 800,000 cigarettes |
| 5 | May 16 through17, 2002 | **TIMOTHY J. FARNHAM and SCOTT SNYDER** | 325 cases; 3,250,000 cigarettes |
| 6 | June 4 through 20, 2002 | **JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, SERGIO NAJERA-DIAZ and OMAR JARAMILLO** | 269 cases; 2,690,000 cigarettes |
| 7 | June 4 through 20, 2002 | **PETER L. PEMBLETON and ANTHONY LEONE** | 100 cases; 1,000,000 cigarettes |

| Count | Date(s) | Defendant(s) | Number of Cases and Cigarettes |
|-------|---------|--------------|-------------------------------|
| 8 | June 4 through 20, 2002 | **SCOTT SNYDER** | 169 cases; 1,690,000 cigarettes |
| 9 | July 16 through August 14,  2002 | **JORGE ABRAHAM, ROBERT TARANTINO, and DEAN MILLER** | 748 60-carton cases, 8,976,000 cigarettes |
| 10 | July 26 through September 9, 2002 | **JORGE ABRAHAM, SERGIO NAJERA- DIAZ, MARIO LUEVANO-GARCIA, FERNANDO ORTIZ, FELIPE CASTANEDA, ANTONIO ARANDA and LORENZO ENRIQUE CAMPOS** | 300 cases; 3,000,000 cigarettes |
| 11 | July 31 through August 22, 2002 | **JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, SERGIO NAJERA-DIAZ, OMAR JARAMILLO, PABLO MAURICIO FLORES - RIOS and FERNANDO ORTIZ** | 616 cases; 6,160,000 cigarettes |
| 12 | July 31 through August 22, 2002 | **PETER L. PEMBLETON and ANTHONY LEONE** | 310 cases; 3,100,000 cigarettes |
| 13 | August 1 through September 5, 2002 | **TIMOTHY J. FARNHAM, DONALD DELAND and SCOTT SNYDER** | 306 cases; 3,060,000 cigarettes |
| 14 | July 25 through August 14, 2002 | **JORGE ABRAHAM, LORENZO ENRIQUE CAMPOS, DEAN MILLER and ROBERT TARANTINO** | 793 cases; 7,930,000 cigarettes |

| Count | Date(s) | Defendant(s) | Number of Cases and Cigarettes |
|-------|---------|--------------|-------------------------------|
| 15 | August 19 through October 3, 2002 | **JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, PABLO MAURICIO FLORES -RIOS, FERNANDO ORTIZ, LORENZO ENRIQUE CAMPOS, SERGIO NAJERA-DIAZ, ANTONIO ARANDA, MARIO LUEVANO-GARCIA and SAUL IGLESIAS** | 751 cases; 7,510,000 cigarettes |

in violation of Title 18, United States Code, Sections 2 and 545.

<u>COUNTS SIXTEEN through FORTY SIX</u>
**[18 U.S.C. §§ 2 & 2342(a)]**
**Aiding and Abetting, and Trafficking in Contraband Cigarettes**

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in Count One as if fully set out herein.

On or about the dates alleged below, in the Western District of Texas, the Central District of California, the Western District of New York, the Southern District of Texas, the Southern District of Florida, and elsewhere, the Defendants alleged below as principals, and as aiders and abettors, did knowingly and unlawfully ship, transport, receive, possess, sell, distribute and purchase contraband cigarettes, as that term is defined in Title 18, United States Code, Section 2341(2), in the approximate amount(s) alleged below, which bore no evidence of the payment of applicable State cigarette taxes for the State(s) alleged below:

30

| Count | Date(s) and applicable State(s) | Defendant(s) | Number of Cases and Cigarettes |
|---|---|---|---|
| 16 | April 2001 through September 2001; Texas, California | **JORGE ABRAHAM** | 1,479 cases; 14,790,000 cigarettes |
| 17 | July 2001 through October 2001; Texas | **JORGE ABRAHAM** | 300 cases; 3,000,000 cigarettes |
| 18 | October 2001; Texas, California | **JORGE ABRAHAM** | 100 cases; 1,000,000 cigarettes |
| 19 | October 2001; Texas | **JORGE ABRAHAM** | 150 cases; 1,500,000 cigarettes |
| 20 | February 12, 2002; Texas | **JORGE ABRAHAM and FERNANDO ORTIZ** | 437 cases; 4,370,000 cigarettes |
| 21 | March 8, 2002; Texas | **JORGE ABRAHAM and FERNANDO ORTIZ** | 350 cases; 3,500,000 cigarettes |
| 22 | March 15, 2002; Texas | **JORGE ABRAHAM and FERNANDO ORTIZ** | 350 cases; 3,500,000 cigarettes |
| 23 | March 20, 2002 through May 7, 2002; Texas, New York | **JORGE ABRAHAM, FELIPE CASTANEDA, SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ, MARIO LUEVANO-GARCIA, PABLO MAURICIO FLORES -RIOS, PETER L. PEMBLETON, ANTHONY LEONE and FERNANDO ORTIZ** | 140 cases; 1,400,000 cigarettes |
| 24 | April 2002; Texas | **JORGE ABRAHAM and FERNANDO ORTIZ** | 500 cases; 5,000,000 cigarettes |

31

| Count | Date(s) and applicable State(s) | Defendant(s) | Number of Cases and Cigarettes |
|---|---|---|---|
| 25 | April 2002 through May 2002; Texas | JORGE ABRAHAM, FELIPE CASTANEDA, SERGIO NAJERA-DIAZ and FERNANDO ORTIZ | 100 cases; 1,000,000 cigarettes |
| 26 | May 16 through 17, 2002; Texas, New York | JORGE ABRAHAM, FELIPE CASTANEDA, SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ, FERNANDO ORTIZ and TIMOTHY J. FARNHAM | 325 cases; 3,250,000 cigarettes |
| 27 | May 16 through 17, 2002; Texas, New York | JORGE ABRAHAM, FELIPE CASTANEDA, SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ, PETER L. PEMBLETON, ANTHONY LEONE and FERNANDO ORTIZ | 80 cases; 800,000 cigarettes |
| 28 | May 17, 2002; Texas, New York | JORGE ABRAHAM, FELIPE CASTANEDA, SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ and FERNANDO ORTIZ | 553 cases; 5,530,000 cigarettes |
| 29 | June 2002; Texas; New York | JORGE ABRAHAM and FELIPE CASTANEDA | 25 cases; 250,000 cigarettes |
| 30 | June 4 through 20, 2002; Texas, New York | JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, SERGIO NAJERA-DIAZ and OMAR JARAMILLO | 269 cases; 2,690,000 cigarettes |
| 31 | June 4 through 20, 2002; New York | PETER L. PEMBLETON and ANTHONY LEONE | 100 cases; 1,000,000 cigarettes |

| Count | Date(s) and applicable State(s) | Defendant(s) | Number of Cases and Cigarettes |
|---|---|---|---|
| 32 | June 4 through 20, 2002; New York | SCOTT SNYDER | 169 cases; 1,690,000 cigarettes |
| 33 | July 1 through 20, 2002; Texas, New York | JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, SERGIO NAJERA- DIAZ, OSCAR CESAR GARCIA JAQUEZ, OMAR JARAMILLO and FERNANDO ORTIZ | 300 cases; 3,000,000 cigarettes |
| 34 | July 1 through 20, 2002; New York | PETER L. PEMBLETON and ANTHONY LEONE | 200 cases; 2,000,000 cigarettes |
| 35 | July 1 through 20, 2002; New York | TIMOTHY J. FARNHAM and SCOTT SNYDER | 100 cases; 1,000,000 cigarettes |
| 36 | July 16 through 27, 2002; Texas, California | JORGE ABRAHAM, SERGIO NAJERA-DIAZ, OSCAR CESAR GARCIA JAQUEZ, PABLO MAURICIO FLORES -RIOS and FERNANDO ORTIZ | 207 cases; 2,070,000 cigarettes |
| 37 | July 22 through 31, 2002; Texas, New York | JORGE ABRAHAM and FERNANDO ORTIZ | 600 cases; 6,000,000 cigarettes |
| 38 | July 22 through 31, 2002; New York | ANTHONY LEONE and PETER L. PEMBLETON | 300 cases; 3,000,000 cigarettes |
| 39 | July 22 through 26, 2002; New York | TIMOTHY J. FARNHAM, DONALD DELAND and SCOTT SNYDER | 300 cases; 3,000,000 cigarettes |

| Count | Date(s) and applicable State(s) | Defendant(s) | Number of Cases and Cigarettes |
|-------|--------------------------------|--------------|-------------------------------|
| 40 | July 26 through September 9, 2002; Texas, New York | **JORGE ABRAHAM, SERGIO NAJERA- DIAZ, MARIO LUEVANO-GARCIA, FERNANDO ORTIZ, FELIPE CASTANEDA, ANTONIO ARANDA and LORENZO ENRIQUE CAMPOS** | 300 cases; 3,000,000 cigarettes |
| 41 | July 31 through August 22, 2002; Texas, New York | **JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, SERGIO NAJERA-DIAZ, OMAR JARAMILLO, PABLO MAURICIO FLORES -RIOS and FERNANDO ORTIZ** | 616 cases; 6,160,000 cigarettes |
| 42 | July 31 through August 22, 2002; New York | **PETER L. PEMBLETON and ANTHONY LEONE** | 310 cases; 3,100,000 cigarettes |
| 43 | August 1 through September 5, 2002; New York | **TIMOTHY J. FARNHAM, DONALD DELAND and SCOTT SNYDER** | 306 cases; 3,060,000 cigarettes |
| 44 | August 19 through October 3, 2002; Texas, New York | **JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, PABLO MAURICIO FLORES -RIOS, FERNANDO ORTIZ, LORENZO ENRIQUE CAMPOS, SERGIO NAJERA-DIAZ, ANTONIO ARANDA, MARIO LUEVANO-GARCIA and SAUL IGLESIAS** | 751 cases; 7,510,000 cigarettes |

34

| Count | Date(s) and applicable State(s) | Defendant(s) | Number of Cases and Cigarettes |
|---|---|---|---|
| 45 | September 13 through October 24, 2002; Texas, New York | **JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM, PABLO MAURICIO FLORES -RIOS, TIMOTHY J. FARNHAM, DONALD DELAND and FERNANDO ORTIZ** | 500 cases; 5,000,000 cigarettes |
| 46 | December 17 through 20, 2002; Texas | **JORGE ABRAHAM, FELIPE CASTANEDA, IGNACIO ABRAHAM and OSCAR CESAR GARCIA JAQUEZ** | 50 cases; 500,000 cigarettes |

in violation of Title 18, United States Code, Sections 2 and 2342(a).

## COUNTS FORTY SEVEN through FORTY NINE
### [18 U.S.C. §§ 2 & 2320(a)]
### Aiding and Abetting, and Trafficking in Counterfeit Cigarettes

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in Count One as if fully set out herein.

On or about the dates alleged below, in the Western District of Texas, the Central District of California, the Southern District of California, the Western District of New York, the District of New Jersey and elsewhere, the Defendants alleged below as principals, and aiders and abettors, intentionally did traffic and attempt to traffic in goods, namely: cigarettes, and knowingly used counterfeit marks, as alleged below, on and in connection with such goods:

35

| Count | Date(s) | Defendant(s) | Number of cases and cigarettes; and markings |
|---|---|---|---|
| 47 | July 16 through August 14, 2002 | **JORGE ABRAHAM, DEAN MILLER and ROBERT TARANTINO** | 748 60-carton cases, 8,976,000 cigarettes; "Marlboro" |
| 48 | July 1 through 24, 2002 | **JORGE ABRAHAM, IGNACIO ABRAHAM, FELIPE CASTANEDA, OSCAR CESAR GARCIA-JAQUEZ, SERGIO NAJERA-DIAZ, DONALD DELAND, TIMOTHY J. FARNHAM and SCOTT SNYDER** | 104 60-carton cases; 1,248,000 cigarettes of "Marlboro Lights" 14 60-carton cases; 168,000 cigarettes of "Marlboro" |
| 49 | July 25 through August 14, 2002 | **JORGE ABRAHAM, LORENZO ENRIQUE CAMPOS, DEAN MILLER and ROBERT TARANTINO** | 793 total 50-carton cases; 7,930,000 Cigarettes of "Marlboro" and "Marlboro Lights" |

in violation of Title 18, United States Code, Sections 2 and 2320(a).

## COUNTS FIFTY through FIFTY SIX
### [18 U.S.C. §§ 2 & 1343]
### Aiding and Abetting, and Wire Fraud

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in

Count One as if fully set out herein.

On or about the dates alleged below, in the Western District of Texas, the Western District

of New York, and elsewhere, the Defendants alleged below as principals, and aiders and abettors,

having knowingly devised and attempted to devise a scheme and artifice to defraud the states of

Texas, California and New York, and the USCS of all applicable duties and taxes for cigarettes, both

contraband and counterfeit, and for the purpose of executing and attempting to execute such scheme

36

and artifice, did transmit and cause to be transmitted by means of a wire communication, namely telephonic conversation(s), in interstate commerce, certain signs, signals and sounds, which wire communication(s) occurred over the telephone numbers alleged below, relating to the shipment, transport, receipt, possession, sale, distribution and purchase of contraband and counterfeit cigarettes:

| Count | Date | Defendant(s) | Communication occurred over Telephone Numbers |
|-------|------|--------------|-----------------------------------------------|
| 50 | July 25, 2002 | **JORGE ABRAHAM and TIMOTHY J. FARNHAM** | (915) 253-6015 and (716) 665-7805 |
| 51 | July 31, 2002 | **JORGE ABRAHAM and DEAN MILLER** | (915) 253-6015 and (619) 300-9004 |
| 52 | August 14, 2002 | **JORGE ABRAHAM and SCOTT SNYDER** | (915) 253-6015 and (716) 640-3275 |
| 53 | August 23, 2002 | **JORGE ABRAHAM, ROBERT TARANTINO and FERNANDO ORTIZ** | (915) 253-6015 and (917) 940-8686 |
| 54 | September 4, 2002 | **JORGE ABRAHAM and PABLO MAURICIO FLORES -RIOS** | (915) 727-1610 and (915) 727-1674 |
| 55 | September 6, 2002 | **JORGE ABRAHAM and TIMOTHY J. FARNHAM** | (915) 253-6015 and (716) 665-7805 |
| 56 | September 11, 2002 | **JORGE ABRAHAM and FELIPE CASTANEDA** | (915) 726-3575 and (915) 727-1610 |

in violation of Title 18, United States Code, Sections 2 and 1343.

## COUNTS FIFTY-SEVEN through SIXTY
### [18 U.S.C. §§ 2 & 1341]
### Aiding and Abetting, and Mail Fraud

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in Count One as if fully set out herein.

On or about the dates alleged below, in the Western District of Texas, the Western District of New York and elsewhere, the Defendants alleged below as principals, and aiders and abettors, having knowingly devised and attempted to devise a scheme and artifice to defraud the states of Texas, California and New York, and the USCS of all applicable duties and taxes for cigarettes, both contraband and counterfeit, and for the purpose of executing and attempting to execute such scheme and artifice, did knowingly cause to be sent, delivered and moved by the Postal Service and a commercial interstate carrier, namely: FedEx and DHL, as alleged below, according to the directions thereon, a matter and thing, namely: samples of contraband and counterfeit cigarettes and documents, as alleged below, to use in defrauding the states of Texas, California and New York, and the USCS, as alleged below:

| Count | Date(s) | Carrier | Defendant(s) | Item(s), sent, delivered and moved |
|-------|---------|---------|--------------|-----------------------------------|
| 57 | July 30, 2002 | FedEx | **JORGE ABRAHAM and DEAN MILLER** | bill of lading, packing list, commercial invoice, |
| 58 | July 31, 2002 | DHL | **JORGE ABRAHAM, FELIPE CASTANEDA, and IGNACIO ABRAHAM** | "Marlboro" cigarettes |
| 59 | August 22, 2002 | FedEx | **JORGE ABRAHAM and ROBERT TARANTINO** | USCS entry summary forms |

38

| Count | Date(s) | Carrier | Defendant(s) | Item(s), sent, delivered and moved |
|-------|---------|---------|--------------|-----------------------------------|
| 60 | August 27, 2002 | U.S. Postal Service | **JORGE ABRAHAM, ROBERT TARANTINO and LORENZO ENRIQUE CAMPOS** | USCS Form 7512, a completed 7512 for a T& E, completed 7512 for a I.T., dock receipts |

in violation of Title 18, United States Code, Sections 2 and 1341.

## COUNT SIXTY ONE
### [18 U.S.C. § 1001]
### Material False Statements and Representations

On or about August 30, 2002, in the Western District of Texas, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely: United States Customs Service, an agency of the United States, the Defendant,

### FELIPE CASTANEDA,

knowingly and willfully made a false and fictitious material statement and representation, in that the Defendant stated: that a May 17, 2002, shipment of cigarettes was a special order destined for Guadalajara and Distrito Federal, Mexico; that he did not know the "Tim" on the bills of lading for the May, 17, 2002, shipment; that the maroon van was to escort the cigarettes to Mexico on May 17, 2002; that he did not know the location of Salamanca and Irving, New York; that he had never sent shipments of anything to New York; that he did not sell cigarettes in the U.S.; that he dealt exclusively with Mexican customers; that he worked alone; and that **JORGE ABRAHAM** did not deal in cigarettes, when in truth and in fact, the Defendant did know that the May 17, 2002, shipment of cigarettes was destined for Salamanca and Irving, New York and not Mexico; that the name

39

"Tim" on the bills of lading for the May 17, 2002, shipment was a reference to **TIMOTHY J. FARNHAM**, who he had previously met with and spoken to prior to August 30, 2002; that since the shipment of cigarettes was destined for New York, the maroon van was not going to escort the cigarettes to Mexico on May 17, 2002; that he did know the locations of Salamanca and Irving, New York, since he had been to those locations prior to August 30, 2002; that he had sent shipments to New York and gone to New York personally to ensure the delivery of prior shipments; that he did sell cigarettes in the U.S.; that he did not deal exclusively with Mexican customers; that he worked for **JORGE ABRAHAM** and did not work alone; and that **JORGE ABRAHAM** did deal in cigarettes, in violation of Title 18, United States Code, Section 1001.

## THE MONEY LAUNDERING CONSPIRACY AND ITS OBJECTS
## COUNT SIXTY TWO
### [18 U.S.C. § 1956(h)]
### Conspiracy to Launder Monetary Instruments

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in Count One as if fully set out herein.

Beginning on or about February 2002 and continuing through and including on or about September 2002, in the Western District of Texas, the Southern District of California, the Central District of California, the Western District of New York, the District of New Jersey, the Republic of Mexico, Taiwan and elsewhere, the Defendants,

**JORGE ABRAHAM,**
**FELIPE CASTANEDA,**
**IGNACIO ABRAHAM,**
**PABLO MAURICIO FLORES -RIOS,**
**DEAN MILLER,**
**ROBERT TARANTINO,**
**SCOTT SNYDER,**
**TIMOTHY J. FARNHAM,**

40

**DONALD DELAND,**
**PETER L. PEMBLETON, and**
**ANTHONY LEONE,**

knowingly and wilfully did combine, conspire, confederate and agree together, and with each other, with other unindicted co-conspirators and with others both known and unknown to the grand jury, to commit an offense against the United States, that is they conspired to:

conduct and attempt to conduct a financial transaction, affecting interstate commerce, knowing that the property in the financial transaction represented the proceeds of unlawful activity and which involved the proceeds of a specified unlawful activity, that is: smuggling in contraband and counterfeit cigarettes, trafficking in contraband cigarettes, trafficking in counterfeit cigarettes, mail fraud, and wire fraud with the intent to promote the carrying on of the specified unlawful activity, a violation of Title 18, United States Code, Section 1956 (a)(1)(A)(i); and

transport, transmit and transfer, and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is: smuggling in contraband and counterfeit cigarettes, trafficking in contraband cigarettes, trafficking in counterfeit cigarettes, mail fraud and wire fraud in violation of Title18, United States Code, Section 1956 (a)(2)(A), all in violation of Title18, United States Code, Section 1956(h).

## COUNTS SIXTY THREE through EIGHTY EIGHT
### [18 U.S.C. §§ 2 & 1956 (a)(1)(A)(i)]
### Aiding and Abetting, and Laundering Monetary Instruments

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in Count One as if fully set out herein.

41

On or about the dates alleged below, in the Western District of Texas, the Western District of New York, the Southern District of California and elsewhere, the Defendants alleged below as principals, and aiders and abettors, did conduct and attempt to conduct a financial transaction, affecting interstate commerce, in the amount alleged below, knowing that the property in the financial transaction represented the proceeds of unlawful activity and which involved the proceeds of a specified unlawful activity, that is: smuggling in contraband and counterfeit cigarettes, trafficking in contraband cigarettes, trafficking in counterfeit cigarettes, mail fraud, and wire fraud with the intent to promote the carrying on of the specified unlawful activity:

| Count | Date | Defendant(s) | Amount of financial transaction(s) |
|-------|------|-------------|-----------------------------------|
| 63 | February 11, 2002 | **JORGE ABRAHAM** | $19,960.00 |
| 64 | February 21, 2002 | **TIMOTHY J. FARNHAM dba, Tobacco Traders & Trust, and JORGE ABRAHAM** | $105,600.00 |
| 65 | March 11, 2002 | **TIMOTHY J. FARNHAM dba, Tobacco Traders & Trust, and JORGE ABRAHAM** | $83,750.00 |
| 66 | March 11, 2002 | **JORGE ABRAHAM** | $143,500.00 |
| 67 | March 27, 2002 | **JORGE ABRAHAM** | $205,000.00 |
| 68 | April 8, 2002 | **DONALD DELAND** | $57,000.00 |
| 69 | April 9, 2002 | **JORGE ABRAHAM** | $125,990.00 |
| 70 | June 20, 2002 | **PETER L. PEMBLETON and IGNACIO ABRAHAM** | $59,020.00 |
| 71 | June 20, 2002 | **PETER L. PEMBLETON and JORGE ABRAHAM** | $59,000.00 |

| Count | Date | Defendant(s) | Amount of financial transaction(s) |
|---|---|---|---|
| 72 | July 12, 2002 | JORGE ABRAHAM and DEAN MILLER | $30,000.00 |
| 73 | July 12, 2002 | IGNACIO ABRAHAM and DEAN MILLER | $40,000.00 |
| 74 | July 17, 2002 | JORGE ABRAHAM | $50,000.00 |
| 75 | July 19, 2002 | PETER L. PEMBLETON and IGNACIO ABRAHAM | $15,000.00 |
| 76 | July 22, 2002 | PETER PEMBLETON, dba, All Nations, ANTHONY LEONE and JORGE ABRAHAM | $56,000.00 |
| 77 | July 25, 2002 | SCOTT SNYDER, TIMOTHY J. FARNHAM and JORGE ABRAHAM | $51,000.00 |
| 78 | July 26, 2002 | JORGE ABRAHAM and DEAN MILLER | $25,000.00 |
| 79 | July 31, 2002 | SCOTT SNYDER, dba Iroquois Tobacco Co., TIMOTHY J. FARNHAM and JORGE ABRAHAM | $38,000.00 |
| 80 | July 31, 2002 | PETER PEMBLETON, dba, All Nations, and JORGE ABRAHAM | $147,000.00 |
| 81 | August 1, 2002 | PETER PEMBLETON, dba, All Nations, and JORGE ABRAHAM | $79,000.00 |
| 82 | August 2, 2002 | TIMOTHY J. FARNHAM, dba, Tobacco Traders & Trust, and JORGE ABRAHAM | $40,000.00 |
| 83 | August 5, 2002 | PETER PEMBLETON, dba, All Nations, ANTHONY LEONE and JORGE ABRAHAM | $25,000.00 |
| 84 | August 7, 2002 | JORGE ABRAHAM, and ROBERT TARANTINO | $25,000.00 |
| 85 | August 19, 2002 | JORGE ABRAHAM and ROBERT TARANTINO | $10,000.00 |

| Count | Date | Defendant(s) | Amount of financial transaction(s) |
|-------|------|--------------|------------------------------------|
| 86 | August 22, 2002 | TIMOTHY J. FARNHAM, dba, Tobacco Traders & Trust, and JORGE ABRAHAM | $14,000.00 |
| 87 | August 27, 2002 | SCOTT SNYDER, dba Iroquois Tobacco Co., DONALD DELAND and JORGE ABRAHAM | $43,750.00 |
| 88 | September 4, 2002 | SCOTT SNYDER and JORGE ABRAHAM | $52,500.00 |
| 89 | September 6, 2002 | PABLO MAURICIO FLORES -RIOS and FELIPE CASTANEDA | $43,016.25 |

a violation of Title18, United States Code, Sections 2 and 1956 (a)(1)(A)(i).

## COUNTS EIGHTY NINE through NINETY
### [18 U.S.C. §1956 (a)(2)(A)]
### Laundering Monetary Instruments

The Grand Jury re-alleges and incorporates the Introduction and the overt acts alleged in Count One as if fully set out herein.

On or about the dates alleged below, in the Western District of Texas, Taiwan and elsewhere, the Defendant alleged below, knowingly did transport, transmit and transfer, and attempt to transport, transmit and transfer a monetary instrument and funds, in the amount alleged below, from a place in the United States to a place outside the United States, namely Taiwan, with the intent to promote the carrying on of specified unlawful activity, that is: smuggling in contraband and counterfeit cigarettes, trafficking in contraband cigarettes, trafficking in counterfeit cigarettes, mail fraud and wire fraud:

44

| 90 | April 4, 2002 | **JORGE ABRAHAM** | $ 80,000.00 |
| 91 | April 5, 2002 | **JORGE ABRAHAM** | $ 50,000.00 |

in violation of Title 18, United States Code, Section 1956 (a)(2)(A).

## NOTICE OF GOVERNMENT'S DEMAND FOR FORFEITURE
### (18 U. S. C. §§ 982, 1956, 1341, 1343 and 371)
### Money Laundering, Mail Fraud and Wire fraud

1. As a result of the foregoing criminal violations as set forth in COUNTS ONE through FORTY-THREE, which are punishable by imprisonment for more than one year, the Defendant, **JORGE ABRAHAM,,** shall forfeit to the United States any and all property constituting or derived from, any proceeds that said Defendant obtained directly or indirectly as a result of the said violations; any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the foregoing violations of this indictment and further these Defendants shall forfeit to the United States all property involved in the Title 18 U.S.C. § 1956 violation and all property traceable to such property, including but not limited to the following:

1. Any and all right, title and interest of Defendant, **JORGE ABRAHAM,** in certain real property described, situated, and located as follows:

Residence located at 104 Appaloosa Court, Sunland Park, New Mexico, also known to be 5 Apploosa Court, Sunland Park, with all appurtenances and improvements thereon, hereinafter referred to as the "Respondent Property," which is more fully described as follows:

**Lot 10, Block 4, LOS RANCHOS DEL RIO SUBDIVISION, in the City of Sunland Park, County of Dona Ana, State of New Mexico as shown and**

45

designated on the Plat thereof, filed in the office of the County Clerk of said County on November 27, 1984 and recorded in Book 13 Pages 344-345, Plat Records.

All in violation of 18 U. S. C. §§ 982, 1956, 1341, 1343, and 371.

2.   As a result of the foregoing criminal violations as set forth in COUNTS ONE through

FORTY TWO Defendants,

JORGE ABRAHAM,
FELIPE CASTANEDA,
IGNACIO ABRAHAM,
ROBERT TARANTINO,
SCOTT SNYDER,
TIMOTHY J. FARNHAM,
DONALD DELAND,
PETER L. PEMBLETON, and
ANTHONY LEONE,

shall forfeit to the United States any and all right, title and interest of Defendants,

JORGE ABRAHAM, aka: George,
FELIPE CASTANEDA,
IGNACIO ABRAHAM, aka: Nasser,
ROBERT TARANTINO, aka: Mr. T; aka: Andy,
SCOTT SNYDER,
TIMOTHY J. FARNHAM, aka: Güero,
DONALD DELAND,
PETER L. PEMBLETON, and
ANTHONY LEONE, aka: Tony, aka: The Italian,

in the sum of Four Million Six Hundred Twenty Eight Thousand One Hundred Seventy One dollars

($4,628,171.00) in UNITED STATES CURRENCY and any interest and proceeds traceable thereto,

is property which was involved in the aforestated offense or is traceable to such property, in violation

of  18 U. S. C. §§ 982, 1956, 1341, 1343, and 371.

46

## SUBSTITUTE ASSETS

3.      If any of the real properties described above in Paragraph 1 of the Notice of

Government's Demand For Forfeiture, as being subject to forfeiture pursuant to 18 U.S. C. §§ 982,

1956, 1341, 1343, and 371 as a result of any act or omission of Defendants,

### JORGE ABRAHAM, aka: George,

a.      cannot be located upon the exercise of due diligence;
b.      has been transferred or sold to, or deposited with, a third person;
c.      has been placed beyond the jurisdiction of the court;
d.      has been substantially diminished in value; or
e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to 18 U. S. C. §§ 982, 1956, 1341 and 371,

to seek forfeiture of any other property of said Defendant,

### JORGE ABRAHAM, aka: George,

up to the value of said property listed in Paragraph 2. above as being subject to forfeiture.

A TRUE BILL.

_____

FOREPERSON OF THE GRAND JURY


JOHNNY SUTTON
UNITED STATES ATTORNEY

By:_____
    Assistant United States Attorney


47

48